| USAO File Number: | 2020R00302 | AUSA: | Kelly Warner | Telephone: (202) 603-3180 |
| AO 106 (Rev. 04/10) Application for a Search Warrant | | Special Agent: | Michael Pemberton | Telephone: (313) 670-9117 |

# UNITED STATES DISTRICT COURT
for the
Eastern District of Michigan

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

Unit 9319
Public Storage
36260 Van Dyke Ave. Sterling Heights, MI 48312

)
)
)
)
)
)
)

Case: 2:23−mc−50832-1
Assigned To : Michelson, Laurie J.
Assign. Date : 4/25/2023
In re: SEALED MATTER (MAW)

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See ATTACHMENT A.

located in the _____Eastern_____ District of _____Michigan_____ , there is now concealed *(identify the person or describe the property to be seized):*

See ATTACHMENT B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
| --- | --- |
| 18 U.S.C. § 1343, 18 U.S.C. § 1347 | Health Care Fraud |
| 18 U.S.C. § 1349 | Conspiracy to Commit Health Care Fraud and Wire Fraud |

The application is based on these facts:

See attached AFFIDAVIT.

☑ Continued on the attached sheet.

☐ Delayed notice _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Michael Pemberton, Special Agent
*Printed name and title*

Sworn to before me and signed in my presence
and/or by reliable electronic means.

Date: _____April 25, 2023_____

*Judge's signature*

City and state: _____Detroit, MI_____

Elizabeth A. Stafford        U. S. Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF<br><br>Unit 9319<br>Public Storage<br>36260 Van Dyke Ave.<br>Sterling Heights, MI 48312 | Case No. USAO # 2020R00302<br>Case: 2:23−mc−50832-1<br>Assigned To : Michelson, Laurie J.<br>Assign. Date : 4/25/2023<br>In re: SEALED MATTER (MAW)<br><br>**FILED UNDER SEAL** |

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, Michael Pemberton, Special Agent for the Department of Health and Human Services, Office of the Inspector General, being duly sworn, depose and state as follows:

**INTRODUCTION**

1.      I am a Special Agent with the United States Department of Health and Human Services ("HHS"), Office of Inspector General ("OIG"), assigned to the Detroit, Michigan, Field Office. I joined the United States Air Force in 1995 and served nearly 13 years on active duty. In 2000, while on active duty, I graduated from the Air Force Office of Special Investigations ("AFOSI") Academy at Andrews Air Force Base, Maryland. I was an AFOSI Special Agent for the last seven years of my

Air Force career. From August 2008 to June 2015, I was a Special Agent with the United States Environmental Protection Agency ("EPA"). Upon becoming an EPA Special Agent, I graduated from the Criminal Investigator Training Program at the Federal Law Enforcement Training Center at Glynco, Georgia.

2.      I have been a Special Agent with HHS-OIG since June 2015. As a Special Agent with HHS-OIG, I am responsible for investigating violations of United States federal law, including, but not limited to, Title 18, United States Code, Section 1347 (Health Care Fraud), Title 18, United States Code, Section 1343 (Wire Fraud), Title 18, United States Code, Section 1349 (Conspiracy to Commit Health Care Fraud and Wire Fraud), Title 18, United States Code, Section 371 (Conspiracy to Pay and Receive Illegal Remunerations), Title 42, United States Code, Section 1320a-7b(b) (Paying and Receiving Illegal Remunerations), Title 18, United States Code, Section 1035 (False Statements in a Health Care Matter), and Title 21, United States Code, Section 841 (Unlawful Distribution of a Controlled Substance). In connection with investigating these offenses, I have participated in the execution of search warrants for documents and other evidence in cases involving violations of these offenses, including at medical facilities, such as pharmacies and individuals' residences.

## PURPOSE OF THE AFFIDAVIT

3.      This affidavit is written in support of an application to search the premises of:

Unit 9319, Public Storage, 36260 Van Dyke Ave., Sterling Heights, Michigan 48312 ("Subject Premises").

4.     As discussed herein, the statements in this affidavit are based upon information I learned during the investigation, information provided to me by other law enforcement agents, and my experience and background as an HHS-OIG Special Agent. Since this affidavit is being submitted for the limited purpose of supporting a search warrant, I have not included every fact known to me concerning this investigation. I have set forth only the facts I believe are necessary to establish probable cause to believe evidence of crime, fruits of crime, and instrumentalities of crime, described below, are located at the Subject Premises.

5.     Based on my training and experience, I know that, generally, pharmacies rely upon computers to create and store data, including billing data, patient files, and claims data. For the reasons stated below, it is likely that patient records, claims data, drug order history, billings, and other business records associated with Harper Drugs, Inc. ("Harper Drugs") will be found stored on the computers and computer-like devices located at the Subject Premises.

6.     As discussed herein, there is probable cause to believe that certain items and property are located within the Subject Premises, including, but not limited to, financial records, patient files, computers, cellular telephones, and other evidence, fruits, and instrumentalities of violations of:

A. Title 18, United States Code, Section 1347, Health Care Fraud;

B. Title 18, United States Code, Section 1343, Wire Fraud; and

C. Title 18, United States Code, Section 1349, Conspiracy to Commit Health Care Fraud and Wire Fraud.

## VIOLATION STATUTES

7.     Title 18, United States Code, Section 1347 prohibits health care fraud: Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice—

(1) to defraud any health care benefit program; or

(2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 10 years, or both.

8.     Title 18, United States Code, Section 1343, which prohibits wire fraud, provides: Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such

scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

9.      Title 18, United States Code, Section 1349 provides that any person who attempts or conspires to commit health care fraud or wire fraud shall be subject to the same penalties as those set forth in 18 U.S.C. §§ 1347 and 1343.

10.     Title 18, United States Code, Section 24(b) defines a "health care benefit program" as, among other things, "any public or private plan . . . affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service, for which payment may be made under the plan."

## THE MEDICARE AND MEDICAID PROGRAMS

11.     The Medicare Program ("Medicare") is a federally funded health care program providing benefits to persons who are sixty-five years of age or older or disabled. Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency within HHS. Individuals who receive Medicare benefits are Medicare "beneficiaries."

12.     Medicare is a "health care benefit program," as defined by 18 U.S.C. § 24(b).

13.     Medicare has four parts: hospital insurance ("Part A"), medical insurance ("Part B"), Medicare Advantage ("Part C"), and prescription drug benefits ("Part D"). This investigation involves Medicare Part D, prescription drug benefits.

5

14.    A pharmacy can participate in Medicare Part D by entering into a retail network agreement directly with the Medicare drug plan provider ("drug plan sponsor") or with one or more Pharmacy Benefit Managers ("PBMs"). A PBM acts on behalf of one or more Medicare drug plans. Through a plan's PBM, a pharmacy can join the plan's network. When a Medicare Part D beneficiary presents a prescription to a pharmacy, the pharmacy submits a claim either directly to the drug plan sponsor or to a PBM that represents the beneficiary's Medicare drug plan. The drug plan sponsor or PBM determines whether the pharmacy is entitled to payment for each claim and periodically pays the pharmacy for outstanding claims. The drug plan sponsor reimburses the PBM for its payments to the pharmacy. PBMs sometimes contract with Pharmacy Services Administrative Organizations ("PSAOs") to administer some of its services, such as payments.

15.    CVS Caremark, OptumRx, and Express Scripts are three of several PBMs. CVS Caremark processes and adjudicates claims electronically in Arizona. OptumRx and Express Scripts process and adjudicate claims electronically outside the state of Michigan.

16.    Medicare, through CMS, compensates drug plan sponsors and pays the sponsors a monthly fee for each Medicare beneficiary of the sponsors' plans. Such payments are called capitation fees. The capitation fee is adjusted periodically based on various factors, including the beneficiary's medical conditions. In addition, in

some cases where a drug plan sponsor's expenses for a beneficiary's prescription drugs exceed that beneficiary's capitation fee, Medicare reimburses the sponsor for a portion of those additional expenses.

17.    By becoming a participating provider in Medicare, enrolled providers agree to abide by the policies, procedures, rules, and regulations governing reimbursement. To receive Medicare funds, enrolled providers, together with their authorized agents, employees, and contractors, are required to abide by all the provisions of the Social Security Act, the regulations promulgated under the Act, and applicable policies, procedures, rules, and regulations, issued by CMS and its authorized agents and contractors.

18.    Medicare providers are required to maintain all records that disclose the extent of services provided and significant business transactions for a period of at least six years.

19.    Qlarant is the Medicare Part D program integrity contractor for CMS under the National Benefit Integrity Medicare Drug Integrity Contract. Qlarant's role is to detect, prevent, and investigate allegations of fraud, waste, and abuse in Part D programs on a national level.

20.    The Michigan Medicaid Program ("Medicaid") is a federal and state funded health care program providing benefits to individuals and families who meet specified financial and other eligibility requirements and certain other individuals

who lack adequate resources to pay for medical care. CMS is responsible for overseeing Medicaid in participating states, including Michigan. Individuals who receive benefits under Medicaid are also referred to as "beneficiaries."

21.    Medicaid covers the costs of medical services and products ranging from routine preventive medical care for children to institutional care for the elderly and disabled. Among the specific medical services and products provided by Medicaid are reimbursements to pharmacies for the provision of prescription drugs. Generally, Medicaid covers these costs if, among other requirements, they are medically necessary and ordered by a physician.

## BLUE CROSS BLUE SHIELD OF MICHIGAN

22.    Blue Cross and Blue Shield of Michigan ("BCBS") is a nonprofit, privately operated insurance company authorized and licensed to do business in the state of Michigan.  BCBS provides health care benefits, including prescription drug benefits, to member entities and individuals.  Individuals insured by BCBS are referred to as BCBS "members."

23.    BCBS has agreements with participating providers, including pharmacies, to furnish medical services to BCBS members.

24.    BCBS is a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

## PROBABLE CAUSE FOR SUBJECT PREMISES
## The 2020 Federal Indictment

25.     On March 12, 2020, Tarek Fakhuri ("Fakhuri"), Hassan Abdallah ("Abdallah"), Raef Hamaed ("Hamaed"), and others were indicted in the Eastern District of Michigan.  (*See* Case # 2:20-cr-20162, ECF No. 1).

26.     The Indictment charged Fakhuri, Abdallah, and Hamaed with Conspiracy to Commit Health Care Fraud and Wire Fraud, in violation of 18 U.S.C. § 1349, for their alleged fraudulent conduct relating to Harper Drugs and other pharmacies they co-owned.  The Indictment also charged Fakhuri with two counts of Health Care Fraud, in violation of 18 U.S.C. § 1347, for alleged fraudulent conduct related to Harper Drugs.

27.     The Indictment alleges that Fakhuri, Abdallah, Hamaed, and others caused a loss of approximately $2.6 million to Medicare and Medicaid by submitting and causing the submission of claims for medications they lacked inventory to dispense at Harper Drugs.

28.     In addition, the Indictment alleges Harper Drugs billed for medication purportedly dispensed to beneficiaries after they were deceased. Medicare Part D claims data and Medicaid claims data for Harper Drugs revealed that between approximately 2011 and January 2016, Harper Drugs submitted 73 claims for medications purportedly dispensed to beneficiaries after their dates of death.

## Dissolution of Harper Drugs

29.    Harper Drugs was a registered business entity with the Michigan Department of Licensing and Regulatory Affairs ("LARA"). The following information is based on publicly available documents filed with LARA on Harper Drugs' behalf.  Fakhuri, Abdallah, and Hamaed incorporated Harper Drugs on September 30, 2005. According to the Certificate of Incorporation, Harper Drugs' registered address was 16461 Harper Ave., Detroit, MI 48224. Harper Drugs' most recent annual report was for the year 2016 and listed Hamaed as the Resident Agent. In 2018, Hamaed, Harper Drugs' President, filed a certificate of dissolution on behalf of Harper Drugs.

30.    On October 15, 2019, I received information from Jacob Poynter ("Poynter"), Licensing Team Analyst, LARA Bureau of Professional Licensing, pertaining to the location of records for Harper Drugs. Poynter provided me with a copy of letter that Hamaed sent on behalf of Harper Drugs to the Michigan Board of Pharmacy (the "letter").  The letter, which was dated August 8, 2016, included Hamaed's name and title, "President, Harper Drugs, Inc." Contained in the letter was the statement, "All records, files and prescription inventory will be removed to Rite Aid Pharmacy #4355 located at 17170 Harper Ave., Detroit, MI 48224." My understanding of the letter's purpose was to inform LARA of where Harper Drugs' drug inventory and records would be kept upon its closing.

31.    Federal and state record retention requirements applicable to pharmacies, as

well as additional requirements applicable to those pharmacies enrolled with Medicaid and Medicare, require pharmacies to retain prescription records for a period of years. *See, e.g.,* 42 C.F.R. § 424.516(f) (providers shall keep records related to medical services provided to Medicare recipients for seven years); Mich. Admin. Code R 338.584(5) (pharmacy shall keep the original prescription records for five years).

### Co-Conspirator H.A.

32.    In further corroboration of the charges in the Indictment, on January 19, 2021, co-conspirator H.A. pled guilty to submitting, or causing the submission of, claims to Medicare, via interstate wires, at Harper Drugs.  H.A. knowingly and willfully conspired with others, including other pharmacists and business partners, to commit health care fraud and wire fraud. In addition, H.A. received the proceeds of this illegal scheme from Harper Drugs.

### Beneficiary Interviews

33.    In November 2019 and January 2020, I interviewed L.C., a Medicare and Medicaid beneficiary who filled prescriptions at Harper Drugs. Claims data reflects that L.C. purportedly received prescriptions from Harper Drugs beginning in 2010. L.C. identified Fakhuri as the pharmacist at Harper Drugs. L.C. stated that s/he did not receive all of the medication that Harper Drugs billed to his/her Medicaid and Medicare insurance.

34.     For example, L.C. did not receive Lidocaine ointment from Harper Drugs. However, in November 2011 and March 2015, Harper Drugs billed L.C.'s Medicare and Medicaid insurance for Lidocaine ointment twice.

35.     As a second example, L.C. stated that s/he only began receiving an Incruse inhaler in November 2019 and had never received Spiriva inhalers. However, Harper Drugs billed L.C.'s Medicare and Medicaid insurance for Incruse inhalers in July and August 2016 and for Spiriva inhalers 66 times between January 2011 and June 2016.

36.     As a third example, L.C. stated that s/he stopped receiving insulin medications Lantus and Humalog from Harper Drugs when s/he began dialysis in late 2014. L.C.'s Medicare billing data indicates that s/he began receiving dialysis in early December 2014. Nevertheless, from January 2015 to February 2016, Harper Drugs billed for 13 refills of Humalog and 12 refills of Lantus.

**Storage Unit Containing Harper Drugs Records (SUBJECT PREMISES)**

**Co-Conspirator H.A.**

37.     On March 7, 2023, I interviewed H.A., who co-owned Harper Drugs with Fakhuri and Hamaed.

38.     During my interview of H.A., s/he stated that Fakhuri rented a storage unit to store Harper Drugs' materials when it closed.

39.     H.A. further stated that Harper Drugs maintained a file on a laptop computer

at the pharmacy on which the fraudulently billed drugs were identified. H.A. stated that the fraudulent prescriptions were logged on the laptop by the Harper Drugs pharmacy technicians.

### Harper Drugs Employee I.A.

40. On March 15, 2023, I interviewed I.A., who is a former Harper Drugs employee.

41. I.A. stated that s/he worked for Harper Drugs for several years as a pharmacy technician, starting in approximately April or May 2014 and continuing through 2016. Throughout his/her time at Harper Drugs, I.A. assisted with filling and dispensing prescriptions to customers.

42. During my interview of I.A., s/he provided the following information: I.A. stated that, when Harper Drugs was closing,[1] Fakhuri asked her/him to rent a storage unit at Public Storage, 36260 Van Dyke Ave., Sterling Heights, Michigan ("Public Storage"), for the purpose of storing records related to Harper Drugs. I.A. agreed and leased a storage unit from Public Storage—the Subject Premises.

43. I.A. stated that everything that Rite Aid did not take when it purchased Harper Drugs is contained in the storage unit, including boxes full of papers.

44. From my training and experience, I know that the type of paper records

---

[1] As noted above, LARA records indicate that Harper Drugs notified the Michigan State Board of Pharmacy of its closure on August 8, 2016. Rite Aid purchased Harper Drugs from the owners.

pharmacies maintain on site include signature logs, hard copy prescriptions, prescription labels, and drug purchase invoices from pharmaceutical wholesalers.

45.     I.A. further stated that, during the time s/he worked at Harper Drugs, at Fakhuri's direction, s/he typed certain information from prescription labels generated by Harper Drugs the day prior into an Excel spreadsheet stored on a laptop computer used at Harper Drugs. I.A. entered dates and prescription numbers into the Excel spreadsheet, continually adding to a running list of information from prescription labels.

46.     I.A. further stated that, in the summer of 2022, Fakhuri requested that I.A. obtain a key for the unit because Fakhuri lost the initial key issued, and Public Storage would not provide a key to Fakhuri because the storage unit was not in his name.  Public Storage replaced the lock and provided the new key to I.A., who then provided it to Fakhuri.

47.     I.A. stated that Fakhuri paid the monthly rental costs for the Subject Premises. I.A. provided a Payment History statement from I.A.'s Public Storage online account. The Payment History, which is contained below, demonstrates that Public Storage charged a credit card ending in x1239 for monthly payments for the rental cost of the Subject Premises. The most recent payment transaction occurred on March 2, 2023, in the amount of $137.00.

3/16/23, 1:30 PM                                              Your Payment History | Public Storage

 **Your Account**

| Account Number: 22891936

## Payment History

Summary view | Detailed view

Print 🖨

| Date | Unit | Payment | Amount |
|---|---|---|---|
| **Transaction** #1168609965 **Date Received** 03/02/2023 | **Unit Details** 36260 Van Dyke Ave #9319 · 5' x 10' | **Payment Method** CC ****1239 **Transaction Type** Payment | **Amount** $137.00 |
| **Transaction** #1175504577 **Date Received** 02/02/2023 | **Unit Details** 36260 Van Dyke Ave #9319 · 5' x 10' | **Payment Method** CC ****1239 **Transaction Type** Payment | **Amount** $137.00 |
| **Transaction** #238606506 **Date Received** 01/18/2023 | **Unit Details** 36260 Van Dyke Ave #9319 · 5' x 10' | **Payment Method** CC ****1239 **Transaction Type** Payment | Amount $162.20 |
| **Transaction** #236681769 **Date Received** 12/31/2022 | **Unit Details** 36260 Van Dyke Ave #9319 · 5' x 10' | **Payment Method** CC ****1239 **Transaction Type** Payment | Amount $139.40 |

https://www.publicstorage.com/account/payments/history                                    1/8

3/16/23, 1:35 PM

Add/Edit Your Authorized People | Public Storage

**Public Storage**

PAY $

## Your Account
CONTACT INFORMATION ⌄

## Authorized People

Adding an authorized person means that you're giving them permission to access your storage unit.

first name
Tarek

last name
Fakhuri

Remove ✕

Add another authorized person +

Save

https://www.publicstorage.com/account/contact-info/authorized-people?storageOrderItemId=14469301&accountOrderItemId=43980777

1/9

## **Employee R.R.**

48.     On March 15, 2023, I interviewed R.R., another former Harper Drugs'
employee, who confirmed the existence of a laptop at Harper Drugs on which an
Excel spreadsheet used to log prescription information was stored. R.R. stated
Fakhuri gave her/him prescription labels that s/he logged into the Excel spreadsheet.
R.R. further stated that the labels were for drugs the pharmacy needed to order and
did not have inventory to dispense at the time.

16

## REQUEST TO SEIZE COMPUTERS AND COMPUTER RECORDS

49.    It has been my experience and training that, generally, business offices rely upon computers to create and store data, including billing data. It is likely that the providers' insurance billing and patient records, documents, and materials will be found stored on computers in their respective offices. In addition, from my training and experience, I know that emails, pharmacy software systems, and claims submission software can often be accessed from any computer with an internet connection, even computers not physically located at the pharmacy.  It has been my experience that pharmacies that have gone out of business may store computers with their records.

50.    According to Express Scripts pharmacy credentialing documents, Harper Drugs used software from Health Business Systems ("HBS"). On February 20, 2020, I spoke to a representative of HBS and learned that Transaction Data Systems ("TDS") acquired HBS. The representative informed me that the TDS software had remote access capability for customers. TDS customers could request remote access from TDS and, upon approval, could access TDS pharmacy software remotely. TDS customers with remote access privileges could access the TDS software system remotely (*e.g.*, from a laptop).

51.    I reviewed the Express Scripts (PBM) Provider Certification signed by Hamaed on April 9, 2015, relating to the use of computers by Harper Drugs and

Abdallah, Hamaed, and Fakhuri. These documents, which identify Harper Drugs'
software vendor, state that Harper Drugs maintained electronic patient profiles and
was equipped to submit claims electronically. The email address
"harperdrugs@hotmail.com" was listed for the three owners/partners in Harper
Drugs.

52.    In addition, I reviewed documents that were submitted on behalf of Harper
Drugs to the following entities that included the same Hotmail email address as the
contact information for Harper Drugs:

    a.  National Council for Prescription Drug Programs;

    b.  LARA; and

    c.  BCBS Application.

53.    For the reasons stated above, there is probable cause to believe that any
computers stored at the Subject Premises were used to generate false billings and
contain information including records, documents, and materials relating to these
crimes.

54.    Upon securing the Subject Premises, law enforcement personnel trained in
searching and seizing computer data (computer personnel) will access any computer
equipment and storage devices to determine whether these items can be searched on-
site in a reasonable amount of time and without jeopardizing the ability to preserve
data. If computer personnel determine that these items cannot be searched on-site in

a reasonable amount of time and without jeopardizing the ability to preserve data, the agents will seize the computer equipment and storage devices for the purposes of conducting an off-site search, consistent with Federal Rule of Criminal Procedure 41(e)(2)(B).

55.    If the computer personnel determine that the data reviewed does not fall within any of the items to be seized pursuant to this warrant or is not otherwise legally seized, the government will return these items within a reasonable period of time from the date of seizure unless further authorization is obtained from the court.

56.    Authority is sought to search any computer related equipment capable of creating and/or storing information in electronic or magnetic form for the items listed in Attachment B. "Computer related equipment" refers to:

- Computer hardware, consisting of all equipment that can collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, optical, or similar computer impulses or data. Hardware includes, but is not limited to, any data-processing devices (such as central processing units, memory typewriters, self-contained "laptop" or "notebook" computers, "palm pilots" or personal data assistants, "tablet" computing devices, smartphones, iPods or other similar media devices, memory facsimile machines, and "schedulers"); internal and peripheral storage devices (such as fixed disks, external hard drives, floppy disk drives and

diskettes, USB storage devices, optical storage devices, transistor-like binary devices, read/write CD and DVD devices, and any and all storage devices); peripheral input/output devices (such as keyboards, printers, scanners, video display monitors, mouse devices); and related communications devices (such as modems, cables and connections, recording equipment, RAM or ROM units); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (such as physical keys and locks);

- Computer software, that is, digital information that can be interpreted by a computer and any of its related components to direct the way they work. Software is stored in electronic, magnetic, optical, or other digital form. It commonly includes programs to run operating systems, applications (like word processing, networking, graphics, accounting, presentations or spreadsheet programs), utilities, compilers, interpreters, and communications programs;

- Computer passwords and other data security devices, that is, a string of alphanumeric characters designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programmable code. A password usually operates as a sort of digital key to "unlock" particular storage data security

devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software or digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, destroy or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it; and

- Related communication devices, such as modems, facsimile machines, telephone equipment with built-in memory devices, and answering machines, together with system documentation, operating logs and documentation, and software and instruction manuals.

57.   If it appears that there is/are data security devices involved or the computer system(s) utilizes unusual or proprietary equipment, the computer system may be seized, along with the proprietary equipment.

58.   Based on the foregoing, and consistent with Rule 41(e)(2)(B), when persons executing the warrant conclude that it would be impractical to review the media on-site, authority is sought to seize or image storage media that reasonably appear to contain some or all of the evidence described in the warrant, thus permitting its later examination consistent with the warrant. The examination may require techniques, including, but not limited to, computer-assisted scans of the entire medium, that

might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

## SPECIAL INSTRUCTION REGARDING
## REVIEW OF THE SEIZED MATERIAL

59.     With respect to law enforcement's review of the seized material identified in Attachment B, law enforcement (*i.e.*, the federal agents and prosecutors working on this investigation and prosecution), along with other government officials and contractors whom law enforcement deems necessary to assist in the review of the seized material (collectively, the "Review Team") are hereby authorized to review, in the first instance, the seized material.

60.     If, during the review of the seized material, the review team finds potentially privileged materials, the Review Team will: (1) immediately cease its review of the potentially privileged materials at issue; (2) segregate the potentially privileged materials at issue; and (3) take appropriate steps to safeguard the potentially privileged materials at issue.

61.     Nothing in this Instruction shall be construed to require the Review Team to cease or suspend review of all the seized material upon discovery of the existence of potentially privileged materials within a portion of the seized material.

## CONCLUSION

62.     Based on the foregoing, there is probable cause to believe, and I do believe, that the Subject Premises will contain the items set forth in Attachment B, which

constitute evidence, fruits of crime, and/or instrumentalities of the violations of Title

18, United States Code, Section 1347 (Health Care Fraud), Title 18, United States

Code, Section 1343 (Wire Fraud), Title 18, United States Code, Section 1349

(Conspiracy to Commit Health Care Fraud and Wire Fraud).

## **REQUEST FOR SEALING**

63.    It is respectfully requested that this Court issue an order sealing, until further

order of the Court, all papers submitted in support of this application, including the

application and search warrant. I believe that sealing this document is necessary

because the items and information to be seized are relevant to an ongoing

investigation into the criminal organizations as not all of the targets of this

investigation will be searched at this time. Premature disclosure of the contents of

this affidavit and related documents may have a significant and negative impact on

the continuing investigation and may severely jeopardize its effectiveness.


Michael Pemberton, Special Agent
HHS-OIG


Sworn to before me and signed in my
presence and/or by reliable electronic means.

Hon. Elizabeth A. Stafford
United States Magistrate Judge

Dated:   April 25, 2023

## <u>ATTACHMENT A – PREMISES TO BE SEARCHED</u>

Premises to be searched are:

### <u>Subject Premises</u>

Subject Premises, depicted below, is located at 36260 Van Dyke Ave., Sterling Heights, Michigan 48213, Unit 9319. This address is a storage unit located in a stand-alone storage facility in a mixed commercial area surrounded by other buildings and lots. The main building is a two-story building composed of tan siding, and there is a sign that reads "Public Storage" on the south side of the building. The entrance to the building is on the south side of the building with a red sign reading "Public Storage," and the numbers "36260" appear above the door.  To the east of the main building is a gate that leads to a secured area surrounded by a tan masonry wall with a purple and red stripe at the top. Inside the secure area are rows of single-story tan masonry buildings with orange roll-up style doors.  The single-story tan buildings house the individual storage units. The business is located on the east side of Van Dyke Avenue south of the intersection of Van Dyke Avenue and 16 Mile Road.







**ATTACHMENT B – ITEMS TO BE SEIZED**

For time period 2010 – August 2016

Any and all of the following items concerning or related to any individual or entity

who is reasonably believed to be part of the pharmacy scheme. This information may

be stored or filed and includes any format in which the information may exist,

including the media of hard copy, computer hard disc, digital storage devices, and

computer discs:

1. All records related in any way to patients of any of the above persons or businesses, including, without limitation, the following type of records: patient charts, files, records, treatment cards, prescription records, patient ledger cards, patient complaints, patient sign-in sheets, physician notes, nursing notes, medical assistant notes, and original patient or referral source listings.

2. All documents constituting, concerning, or relating to bills, invoices, and claims for payment or reimbursement for services billed to insurance companies, including Medicare, for any patients.

3. All financial and tax-related books, records, and documents related in any way to the above persons or businesses, including, without limitation:

   a. Bank accounts, money market accounts, checking accounts, equity line of credit, investment accounts, stock fund accounts, bonds or bond funds; including deposits and disbursements, canceled checks or drafts, electronic transfers, ledgers, loan statements, and loan agreements;

   b. Credit/Automatic Teller Machine/debit card accounts;

   c. All corporate, business, and personal tax returns, including, without limitation, any quarterly employment tax returns, withholding records, W-2s, and any Internal Revenue Service Form 1099s;

   d. All loan and credit information, including, without limitation, any letters of credit, revolving credit arrangements, loans, loan applications,

27

financing arrangements, factoring arrangements, promissory notes, leases, or any other documents concerning sources of borrowed funds, including any applications;

e. All information relating to the purchase, titling, and insurance of vehicles, real estate, and other assets, including safe deposit boxes and keys; and

f. All financial statements, accounts payable/receivable, and credit reports.

4. Documentation of all patient appointments or scheduling and patient sign-in sheets.

5. All documents consisting, concerning or relating to all current and former employees, including personnel files, employee rosters, names, addresses, telephone numbers, email addresses, time cards or similar records, expense reports, training information, certification verification, salary and compensation information, disciplinary records, licensure records, job applications, job descriptions, employment agreements, and W-2 forms.

6. All documents constituting, concerning, or relating to work diaries, calendars, logs, appointment books, and schedules.

7. All records related to any payments made to patients or others to induce patients to seek treatment from any of the above referenced individuals or businesses.

8. All invoices and supporting documentation evidencing monies owed to or received from any of the above referenced individuals or businesses.

9. All contracts, billing agreements, professional services agreements, or any other contracts between the above referenced individuals or businesses, and any other individual, company, physician, or billing company.

10. All Medicare, Medicaid, and BCBS handbooks, manuals, newsletters or other Medicare, Medicaid, and BCBS publications.

11. Records of control over other areas such as storage units where financial, medical, or other billing records may be maintained.

12. Records of control of the premises and things described, namely, utility bills, telephone bills, rent, or lease records pertaining to or evidencing ownership or control of the premises to be searched.

13. All retrievable information such as recorded telephone messages, and other electronically stored information and computer hardware, including floppy discs, compact discs, other data storage discs or tapes, or thumb or flash drives. Any electronic storage media, including cellular telephones, pagers, electronic organizers, and PDAs, may be held for such reasonable time as necessary to determine whether it contains data within the ambit of this warrant. When data is found on a personal computer storage drive file, the agents executing this search warrant are authorized to seize, where necessary, the computer system's input/output or "I/O" devices, software, documentation, and data security devices. When the computer analyst determines that these items are no longer necessary to retrieve and preserve that data evidence, they will be returned within a reasonable time.

14. Instructions, memoranda, passwords, and other information relating to, or required to facilitate the operation of, any computer equipment which contains any of the aforesaid information.

15. Organizational or corporate papers filed with the appropriate state agencies and any amendments thereto, including, without limitation, articles of incorporation, by-laws, and annual reports.

16. All correspondence, including memoranda, letters, and electronic mailings (emails) concerning any of the records described in the previous paragraphs.

17. Currency or other items of significant value reasonably believed to be proceeds of the illegal activity described in the affidavit for this search warrant.

18. Records related to assets or items of significant value reasonably believed to be proceeds of the illegal activity described in the affidavit for this search warrant.

19. Regarding records and information pertaining to the above stated offenses which may be stored in digital form, law enforcement personnel executing this search warrant will employ the following procedure in searching for data capable of being read, stored, or interpreted by a computer:

a. Upon securing the premises, law enforcement personnel trained in searching and seizing computer data (the "computer personnel") will make an initial review of any computer equipment and storage devices to determine whether or not these items can be searched on-site in a reasonable amount of time and without jeopardizing the ability to preserve the data.

b. If the computer equipment and storage devices cannot be searched on-site in a reasonable amount of time and without jeopardizing the preservation of the data, then the computer personnel will determine whether it is practical to copy/image the data.

c. If the computer personnel determine it is not practical to perform on-site searching, copying, or imaging (due to time, technical, or other considerations), then the computer equipment and storage devices will be seized and transported to an appropriate law enforcement laboratory for review. The computer equipment and storage devices will be reviewed by appropriately trained personnel in order to extract and seize any data that falls within the list of items to be seized set forth herein.

d. Any data storage device that is encrypted and unreadable will not be returned until law enforcement personnel have determined that it or its data do not constitute (1) an instrumentality of the offense, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed property, or (5) items that fall within the list of items to be seized set forth herein.

e. In searching the data, computer personnel may examine all of the data contained in the computer equipment and storage devices to view their precise contents and determine whether the data falls within the items to be seized as set forth herein.

f. If the computer personnel determine that the computer equipment and storage devices are no longer necessary to retrieve and preserve the data, and the items are not subject to seizure pursuant to Federal Rule of Criminal Procedure 41(b), the government will return these items within a reasonable period of time.

g. In order to search for data pertaining to the above stated offenses that is capable of being read or interpreted by a computer, law enforcement

personnel will need to seize and search the following items, subject to the procedures set forth above:

   i.   Any computer equipment and storage device capable of being used to commit or store evidence of the offenses listed above;

   ii.   Any computer equipment used to facilitate the transmission, creation, display, encoding or storage of data, including, but not limited, to word processing equipment, modems, docking stations, monitors, printer, plotters, encryption devices, and optical scanners;

   iii.   Any magnetic, electronic or optical storage device capable of storing data such as floppy disks, fixed hard disk drives, external hard drives and enclosures, network attached storage units, removable hard disk cartridges, tapes, laser disks, videocassettes, CD's, DVD's, zip disks, smart cards, memory sticks, memory calculators, PDA's, USB flash drives, printers and fax machines with memory buffers, PC cards, electronic dialers, electronic notebooks, mobile telephones, answering machines, and/or other media that is capable of storing magnetic coding;

   iv.   Any documentation, operating logs and reference manuals regarding the operation of the computer equipment, storage devices, or software;

   v.   Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices or data to be searched;

   vi.   Any physical keys, encryption devices or similar physical items that are necessary to gain access to the computer equipment, storage devices, or data; and

   vii.   Any passwords, password files, test keys, encryption codes, or other information necessary to access the computer equipment, storage devices or data.

The terms records, documents, communications, and applications, includes all of the foregoing items of evidence in whatever form and by whatever means such records, documents, communications, applications, their drafts or their modifications may have been created or stored, including (but not limited to) any handmade form (such as writing or drawing with any implement, on any surface, directly or indirectly); any photographic form (such as microfilm, microfiche, prints, slides, negative, videotapes, photocopies); any mechanical form (such as printing or typing); any electrical, electronic, or magnetic form (such as tape recordings, cassettes, compact discs, or any information on an electronic or magnetic storage device, such as floppy diskettes, hard drives, backup tapes, CD ROMs, optical discs, printer buffers, smart cards, memory calculators, or electronic notebooks, as well as printouts and readouts from any magnetic storage.

USAO File Number:   2020R00302   AUSA:   Kelly Warner   Telephone:   (202) 603-3180
AO 93 (Rev. 11/13) Search and Seizure Warrant   Special Agent:   Michael Pemberton   Telephone:   (313) 670-9117

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Michigan

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
)
Unit 9319 )
Public Storage )
36260 Van Dyke Ave. Sterling Heights, MI 48312 )

Case: 2:23−mc−50832-1
Assigned To : Michelson, Laurie J.
Assign. Date : 4/25/2023
In re: SEALED MATTER (MAW)

## SEARCH AND SEIZURE WARRANT

To:   Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ Eastern _____ District of _____ Michigan _____ .
*(identify the person or describe the property to be searched and give its location)*:

See ATTACHMENT A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See ATTACHMENT B, violations of:

**YOU ARE COMMANDED** to execute this warrant on or before _____ May 9, 2023 _____ *(not to exceed 14 days)*
☐ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to  the presiding United States Magistrate Judge on duty  .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:   April 25, 2023   11:43 am

*Elizabeth A. Stafford*
*Judge's signature*

City and state:   Detroit, MI

Elizabeth A. Stafford   U. S. Magistrate Judge
*Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2)

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name of any person(s) seized: | | |

| **Certification** |
|---|

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*